Glen L. Kulik (SBN 082170)
gkulik@kgswlaw.com
Camila Bersani (SBN 326611)
cbersani@kgswlaw.com
KULIK GOTTESMAN SIEGEL & WARE LLP
15303 Ventura Boulevard, Suite 1400
Sherman Oaks, CA  91403
Telephone:  (310) 557-9200
Facsimile:   (310) 557-0224

Attorneys for Plaintiff
Aftermaster, Inc.

# UNITED STATES DISTRICT COURT FOR THE
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AFTERMASTER, INC., a Delaware Corporation,<br><br>                    Plaintiff,<br><br>     v.<br><br>INFINITY POWER AND CONTROLS, INC., a Wyoming corporation,<br><br>                    Defendant. | Case No. 2:19-cv-05771-CJC-FFM<br><br>[The Hon. Cormac J. Carney, Dept. 7C]<br><br>**FIRST AMENDED COMPLAINT FOR:**<br><br>**1.  BREACH OF CONTRACT**<br><br>**2.  FRAUD**<br><br>**3.  NEGLIGENCE**<br><br>**[DEMAND FOR JURY TRIAL]** |

{First Amended Complaint w LR Revisions}

**FIRST AMENDED COMPLAINT**

Plaintiff alleges:

## PARTIES

1. Plaintiff Aftermaster, Inc. ("AM") is a publically traded corporation formed under the laws of the state of Delaware with its principal place of business located in Los Angeles, County, California.

2. Defendant Infinity Power and Controls, Inc. ("IP") is a corporation formed under the laws of the State of Wyoming with its principal place of business located in Rock Springs, Wyoming.

3. At all times mentioned in this Complaint, AM and IP were and are "merchants" as that term is defined in the Uniformed Commercial Code and the California Commercial Code.

## JURISDICTION AND VENUE

4. This court has subject matter jurisdiction over the action pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

5. Venue is proper pursuant to 28 U.S.C. §1391(a)(2) as this court is in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

## COMMON FACTUAL ALLEGATIONS

6. AM is a leading audio technology company that develops and markets audio products that are sold worldwide.

7. AM created and developed the "Aftermaster Pro" television audio remastering device, which has been sold in over 70 countries. The product clarifies and improves the sound that is heard on a television and makes the dialogue crisper and cleaner so it can be better heard and understood.

8. Until July 2017, AM manufactured the Aftermaster Pro itself without

{First Amended Complaint w LR Revisions}  1

**FIRST AMENDED COMPLAINT**

1  any significant incident. Sales of the product were growing and the product was
2  ultimately purchased and sold by major retailers such as Amazon and Home
3  Shopping Network ("HSN").

4      9.    IP is a manufacturer and supplier of industrial power control products.
5  IP learned of and was enamored with the Aftermaster Pro, so much so that it began
6  buying the device from Aftermaster and re-selling it to the public for a higher price.
7  Bruce Pivic ("Pivic") is the Chief Executive Officer of IP.

8      10.    In or about May 2017, AM offered Pivic a position as AM's head of
9  engineering and a contract for that employment relationship was prepared. However,
10 during the course of their discussions, Pivic soon realized that manufacturing the
11 Aftermaster Pro product himself would be much more profitable than working in-
12 house for Aftermaster. Thus, instead of becoming an employee of AM, Pivic stalled
13 the negotiations and ultimately proposed that AM engage IP as the exclusive
14 manufacturer of the Aftermaster Pro. AM was unfamiliar with IP and did not know
15 its capability to manufacture the product in a timely, competent, and professional
16 manner. Thus, in or about July 2017, in response to questions from AM about its
17 background and experience, Pivic orally represented to Mark Depew, Senior Vice
18 President of Finance of AM, and Larry Ryckman, Chief Executive Officer of AM
19 that IP was fully qualified to be the exclusive manufacturer by virtue of its
20 background and experience manufacturing similar products, as one of Wyoming's
21 "top electronics manufacturers." AM subsequently learned this not to be true. Pivic
22 also represented to Depew and Ryckman that IP could produce the Aftermaster Pro
23 in a much more cost efficient manner than AM was doing it, thus using IP would
24 save AM substantial money in the manufacturing process. Pivic represented that IP
25 could produce substantial savings in the manufacturing cost of its product by
26 replacing existing Aftermaster Pro parts with less expensive but equivalent or better
27 parts and that it would pass all the savings along to AM in the form of a substantially
28

{First Amended Complaint w LR Revisions}    2

**FIRST AMENDED COMPLAINT**

reduced per unit price. Finally, Pivic represented on IP's behalf that it would credit AM $3.75 per unit manufactured by IP based on a per unit credit of $375,000 that AM pre-paid for 100,000 circuit boards with the company that IP used for circuit board manufacturing. These representations and promises induced AM to allow IP to manufacture its products. The foregoing representations were made by Pivic in person at AM's offices in California and Arizona and on the phone while Depew and Ryckman were in California.

11.     Thus, in or about July 2017, based on these material misrepresentations, AM entered into an exclusive manufacturing contract with IP for the manufacture of the Aftermaster Pro. A written manufacturing agreement was drafted but never finalized, but the parties started doing business together based on the material terms covered by their oral agreement, which was confirmed in a series of emails and purchase orders sufficient to satisfy the statute of frauds ("Agreement").

12.     When IP began manufacturing the Aftermaster Pro it informed AM that the cost per unit was to be $90 per unit, which was far greater than any pricing previously contemplated. Thereafter, despite AM's objection to the pricing, IP began manufacturing the Aftermaster Pro for AM according to the following terms: When AM received an order from a customer, AM would submit a purchase order to IP, IP would assemble and ship the goods to the customer, the customer would pay AM, and IP would invoice AM at the rate of $90 per unit. Following the foregoing course of conduct, between July 2017 and November 2018, IP manufactured over 10,000 thousand units of the Aftermaster Pro, including several thousand units it sold for its own account.

13.     Pursuant to the Agreement, AM disclosed to IP the former's confidential plans and specifications for the manufacture of the Aftermaster Pro, a unique, patented device, along with the required component parts, packaging, installation instructions, warranty information, and consumer warnings.

14. Within the first few months of the relationship, IP was enamored with AM's product and purchased several thousand units from AM for $90 per unit so IP could resell them to make additional profit. It soon became apparent to AM that IP had intended to act outside the parties' contractual relationship and hijack its product all along.

15. AM and IP discussed ways to bring down the manufacturing cost of the Aftermaster Pro. IP began to unilaterally begin making changes it represented would result in substantial manufacturing savings while maintaining product quality and reliability. IP stopped utilizing AM-approved parts and switching to a less expensive circuit board that was unreliable and not properly tested. IP then removed the power light and changed the shell to an inferior product. IP replaced AM's HDMI cable, which was to be included with every unit, for a much smaller and less expensive item, which caused a significant volume of AM's Aftermaster Pro units to not operate properly. IP also abandoned AM's packaging in favor of smaller and less expensive packaging, and shipped over one thousand units in bubble wrap in a plastic bag. This was intended by IP to reduce its cost to produce the product and increase its profits even though it was at the expense of the quality and reliability of AM's product. The changes resulted in significant cost savings to IP, which IP did not accurately disclose nor credit to AM in any way.

16. In addition, without AM's knowledge or approval, IP eliminated the instruction manual from the product box to save money. The manual contained the installation instructions. IP also eliminated the warranty information and consumer warnings. In addition to failing to credit AM for any of the savings, these changes resulted in a large number of consumer complaints as the purchasers did not know how to install the device. Without the consumer warnings, it put the buyers at risk of physical harm.

17. Also without AM's knowledge or approval, IP changed the power brick which plugs into the wall with a less expensive, "non-UL" approved product. Not only did this potentially put customers and retailers in jeopardy, but AM's largest customer, HSN, will not accept any products if they are not UL approved.

18. Based on all of the inferior changes made by IP, a high number of units were returned as defective. Hundreds of consumers complained of the units not working. AM advised IP on numerous occasions that it must immediately correct the quality and reliability of the product because AM's reputation was being damaged. AM complained to IP in writing, in person, and by phone that its products were deficient and that there were an abnormally high number of returns. IP did nothing in response.

19. Due to the very high number of returns and complaints for the Aftermaster Pro, Amazon stopped carrying the product altogether which has caused enormous damage to AM.

20. HSN experienced unusually high return rates of over 40%, primarily due to defective manufacturing by IP. As a result, AM could not sell any more Aftermaster Pro devices on HSN until it was proven that IP had fixed the problems, but IP failed to do so.

21. In November 2018, with the Aftermaster Pro business in shambles due to IP's conduct, AM terminated the relationship and had to shut down its production and sale of the Aftermaster Pro. Due to the time it took to locate and engage a new manufacturer, and for that manufacturer to commence production, which was a nine-month process, AM has sustained significant losses and the value of its stock plummeted. AM was also left with over 4000 defective units, with a retail value of over $750,000, that it cannot sell.

22. In 2018, AM engaged in an aggressive online marketing campaign for the Aftermaster Pro. IP took advantage of AM's online marketing program and sold

approximately 1,000 Aftermaster Pro units for $90 per unit at a retail price of $180 per unit, through a separate, independent account it set up on Amazon, which was never approved by AM. In addition, IP also sold AM's products it had manufactured directly to consumers in ways never approved by AM and beyond the parties' Agreement. IP also never paid its portion of the online marketing expenses that Aftermaster incurred for IP's sales in the sum of $185,000, which it owes to AM at this time. Aftermaster Pro currently retails for $180.

## FIRST CLAIM FOR RELIEF

(Breach of Contract)

23. AM realleges and incorporates by reference the allegations made above in Paragraphs 1 through 23 of this First Amended Complaint.

24. In or about 2003, AM entered into the oral requirements contract with IP ("Contract") within the meaning of Sections 2106(1) and 2306(1) of the California Commercial Code, thereafter confirmed in writings including correspondence, purchase orders and invoices sufficient to satisfy the requirements of Section 2201(2) of the California Commercial Code. Under the Contract, the parties agreed that IP would be the exclusive manufacturer and distributor of the Aftermaster Pro and would produce and ship the product in a competent manner in accordance with the directions and specifications provided by AM. In exchange, based on IP's representations of its costs to produce the product, by Pivic made in person at AM's offices and on the telephone to Depew and Ryckman in or about July 2017, AM agreed to pay IP the sum of $90 for each unit competently produced in accordance with AM's directions and specifications.

25. The Contract was an agreement for the purchase and sale of goods and was thus subject to Article 2 of the California Commercial Code, which supersedes general California contracts law in regard to such transactions. Under Section 1201(3) of the California Commercial Code, an agreement means "the bargain of the

{First Amended Complaint w LR Revisions}   6

**FIRST AMENDED COMPLAINT**

parties in fact as found in their language or by implication from other circumstances including course of dealing, usage of trade, and course of performance."

26. AM performed every term and condition of the Contract to be performed on its part.

27. Commencing in or about August 2017, IP breached the Contract by committing those acts which are described in paragraphs 14 to 21 hereof.

28. As a direct and proximate result of the breach of contract, AM has been damaged in a sum which cannot presently be calculated with certainty but which is believed to exceed the sum of $10,000,000 according to proof at trial.

## SECOND CLAIM FOR RELIEF

(Fraud)

29. AM realleges and incorporates by reference each of the allegations made above in paragraphs 1 through 29 of this First Amended Complaint.

30. In order to induce AM to enter into the Agreement, in July 2017, Pivic, on IP's behalf, made the material representations to Depew and Ryckman of AM that are specified in paragraph 10 hereof. In fact, IP had no history of manufacturing products similar to the Aftermaster Pro and had neither the experience nor the expertise to do so in a competent, non-defective manner in accordance with AM's guidelines and prototypes. Pivic also misrepresented that any cost savings he achieved would be passed along to AM in the form of a reduced per unit price as alleged in paragraph 10 hereof, which Pivic and IP had no intention of doing as evidenced by the fact that they did all the things referenced in paragraphs 14 to 22 almost immediately after entering into the Agreement, some surreptitiously, without disclosing same to AM, without crediting any cost savings to AM, and in a reckless effort to cut costs for IP's sole benefit in a way that would make the Aftermaster Pro defective and potentially dangerous and illegal. The misrepresentations had been made in or about July 2017 to Depew and Ryckman. The representations were made

by Pivic in person at AM's offices in California and Arizona and on the phone while Depew and Ryckman were in California.

31. The promises made by IP described in paragraphs 10 and 31 hereof were false and known by IP and Pivic to be false when made. When the promises were made by IP there was intent to defraud by using the false representations to induce AM to enter into the Agreement. In reasonable reliance on the misrepresentations, AM did enter into the Agreement which it would not have done had it known the true facts.

32. Separate and apart from the parties' contractual obligations, Pivic and IP also intended, when they made the misrepresentations described in paragraph 10 and 22 of this First Amended Complaint, to manufacture the Aftermaster Pro and sell it outside of the parties' original intended manufacturing Agreement through a separate Amazon account. IP sold the Aftermaster Pro units in ways never approved by AM. Further, it never at any time credited AM with any money to reimburse AM for the $375,000 deposit AM paid for its circuit boards.

33. IP also induced AM to enter into the sales Agreement, in order to achieve the status of "exclusive manufacturer" of the Aftermaster Pro. IP misused this status to mislead AM's consumers about IP's authority to manufacture Aftermaster Pro and then sell these products through an independent account.

34. In reasonable reliance on the promises described in paragraph 28, AM entered into the Agreement with IP, continued to do business with IP for over a year, and continued to pay IP $90 per unit, which price was based on IP's representation of the cost of producing and shipping the product that way it was supposed to be done per AM's instructions. When AM pushed IP for a breakdown of the $90 it said it was spending to make each unit, IP sent a list of costs which included $10 per unit for shipping costs of the parts for each unit. Had AM known or suspected that IP greatly inflated its costs to manufacture the Aftermaster Pro, did not have the

required manufacturing expertise, and that it would manufacture and sell products independently outside the parties Agreement. AM would never have entered into the Agreement.

35. IP's false promises constituted fraud and deceit as proscribed by Sections 1709 and 1710 of the California Civil Code.

36. As a direct and proximate result of the fraud, AM has been damaged in an amount that cannot presently be calculated with certainty but which is believed to exceed the sum of $10,000,000 according to proof.

37. The above conduct by IP was committed with malice, fraud and oppression. As a result thereof IP should be ordered to pay to AM punitive damages under Section 3294 of the Civil Code in the amount of $25,000,000 or such other amount as may be determined at trial.

### THIRD CLAIM FOR RELIEF

(Negligence)

38. AM realleges and incorporates by reference each of the allegations made above in paragraphs 1 through 38 of this Complaint.

39. In undertaking to be the exclusive manufacturer of the Aftermaster Pro on AM's behalf, IP owed a duty of honesty and due care to AM in the manufacture and distribution of the product. IP owed a duty to AM to produce the product in a competent, non-defective, and legal manner, according the patented specs provided by AM to IP for IP to do its job.

40. Between July 2017 and November 2018, IP breached its duty of due care owed to AM by doing those acts described in paragraphs 14 through 20 hereof, which it knew or should have known would result in products that were of inferior quality, defective, and illegal, which in turn would cause harm to consumers, would result in financial losses to AM, and would the tarnish the reputation of AM with customers, with Amazon, and with HSN.

41. IP was also, at minimum, negligent when it misused the status of "exclusive manufacturer" of the Aftermaster Pro to mislead AM's consumers about IP's authority to manufacture Aftermaster Pro and then sell these products through an independent account outside the parties' contractual relationship.

42. As a direct and proximate cause of IP's negligence, AM has been damaged in a sum which cannot be presented calculated with certainty but which is believed to exceed $10,000,000 according to proof at trial.

## PRAYER FOR RELIEF

Wherefore, AM prays for judgment against IP and all Defendants as follows:

FIRST CLAIM FOR RELIEF

A. For damages believed to exceed $10,000,000 according to proof;

B. For prejudgment interest at the maximum rate to the extent allowed by law;

SECOND CLAIM FOR RELIEF

A. For damages believed to exceed $10,000,000 according to proof;

B. For prejudgment interest at the maximum rate allowed by law;

C. For punitive damages of at least $20,000,000 or such other amount as is proven at trial;

THIRD CLAIM FOR RELIEF

A. For damages believed to exceed $10,000,000 according to proof;

B. For prejudgment interest at the maximum rate to the extent allowed by law;

ON ALL CLAIMS FOR RELIEF

A. For costs of suit; and

B. For such other relief as the court deems appropriate.

Dated:  November 20, 2019        KULIK GOTTESMAN SIEGEL & WARE LLP

By: /s/ Glen Kulik
    Glen L. Kulik, Esq.
    Attorneys for Plaintiff
    Aftermaster, Inc.

# PROOF OF SERVICE

I, Camila Bersani, declare:

I am employed in the County of Los Angeles, State of California. I am over the age of 18, and am not a party to the within action. My business address is 15303 Ventura Boulevard, Suite 1400, Sherman Oaks, California 91403.

On November 20, 2019, I served the foregoing document described as **FIRST AMENDED COMPLAINT** on all interested parties by enclosing a true and correct copy thereof in an envelope which was then sealed and addressed as follows:

| | |
|---|---|
| Rinat Klier-Erlich, Esq.<br>MANNING & KASS<br>ELLROD, RAMIREZ, TRESTER LLP<br>801 S. Figueroa St, 15th Floor<br>Los Angeles, CA 90017-3012<br>rke@manningllp.com<br>(213)624-6900<br><br>***Attorney for Defendant*** | Brian A. Weinberge, Esq.<br>WEINBERGER LAW<br>5635 N. Scottsdale Road. Suite 170<br>Scottsdale, AZ 85250<br>weinbergerlawaz@gmail.com<br>(480)729-6275<br><br><br>***Attorney for Defendant*** |

☒ **BY CM/ECF NOTICE OF ELECTRONIC FILING:** I electronically filed the document(s) with the Clerk of the Court by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system. Participants in the case who are not registered CM/ECF users will be served by mail or by other means permitted by the court rules.

Executed on November 20, 2019, at Sherman Oaks, California.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

  Camila Bersani                              /s/ Camila Bersani
Type or print name                        Signature